UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
* * * * * * * * *

**JOSEPH MCKINNEY**,

       Plaintiff,

v.

**CARRINGTON MORTGAGE SERVICES, LLC**,

       Defendant.

Civil Action

Case No.

Hon.

---

**COMPLAINT AND REQUEST FOR JURY TRIAL**

**INTRODUCTION**

1. Plaintiff, Joseph McKinney, brings this action for violations of the Real Estate Settlement Procedures Act and the Equal Credit Opportunity Act based on Defendant's violations of those acts and refusal to review Plaintiff for loss mitigation options short of foreclosure.

**PARTIES AND JURISDICTION**

2. Plaintiff is a resident of Newaygo County, Michigan.

3. Defendant, Carrington Mortgage Services, LLC. (hereinafter "Carrington"), is a foreign limited liability company that regularly conducts business in Michigan; and maintains a registered agent in Michigan.

4. This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims based on violations of

1

federal law.

5. Venue is proper in this district under 28 U.S.C. § 1391 because Defendant resides in this district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

6. Plaintiff, Joseph McKinney, owns a home at 2335 11 Mile Road, Bitely, Michigan, (hereinafter "the Home") which is his only residence.

7. McKinney purchased the Home at the age of 65 in 2008, with a mortgage loan from Polaris Home Funding Corporation.

8. As part of that purchase, McKinney granted MERS, as nominee for Polaris Home Funding Corporation, a mortgage, dated August 29, 2008, and recorded in the Newaygo County Register of Deeds as Libor 442, Page 4143 (hereinafter "Mortgage"), giving a security interest in the Home to secure repayment of $63,335.00.

9. McKinney has experienced some financial difficulties since purchasing the Home, and filed for Chapter 7 Bankruptcy protection in 2013; McKinney's debts were discharged in December 2013 without reaffirming his mortgage.

10. For the past several years, McKinney's primary source of income has been his social security benefits; however, McKinney has also worked as a self-employed handyman for additional income.

11. In about 2014, the servicing of McKinney's Mortgage was transferred to Carrington.

12. In October 2014, a loss in his side income caused McKinney to fall behind in his Mortgage payments.

13. Carrington sent McKinney a letter dated January 22, 2015, in which it informed McKinney that his loan was in default, and would be referred to foreclosure. (See Exhibit. 1).

14. According to the January 22 letter, McKinney's mortgage was paid through September 1, 2014.

15. Carrington sent McKinney a letter dated January 28, 2015, in which it stated that McKinney's mortgage had been referred to foreclosure, and offering several loss mitigation options. (See Exhibit 2).

16. By January 2015, McKinney had begun working with housing counselors at Home Repair Services (HRS), a non-profit agency located in Grand Rapids, Michigan, to help in avoiding foreclosure.

17. In late January or early February 2015, a counselor at HRS submitted a complete loss mitigation package to Carrington.

18. In a letter dated February 7, 2015, Carrington confirmed that it had received a complete initial package. This was also confirmed in a telephone call between a housing counselor and an agent of Carrington. (See Exhibit 3).

19. At some point, Carrington decided that it needed additional information, but could not explain to McKinney's housing counselor what information was missing; apparently, Carrington wanted an explanation for why McKinney had not filed federal tax returns in 2013 or 2014.

20. McKinney faxed a letter of explanation on February 27, 2015.

21. Carrington sent McKinney a letter dated April 3, 2015, in which it stated that McKinney was ineligible for the Home Affordable Modification Program, and that Carrington could not "consider your request or continue to provide you with assistance . . ." The letter identifies other possible work-out options, but does not indicate that McKinney was reviewed for any of these options. (See Exhibit 4).

22. Shortly after the April 3 letter, Carrington referred McKinney's mortgage to Fabrizio and Brook, P.C. for foreclosure.

23. A Notice of Foreclosure was first published in the Times-Indicator, a Newaygo County newspaper, on May 13, 2015, and a Notice of Foreclosure was posed on McKinney's home on May 26, 2015. The sale was originally scheduled for June 16, 2015. (See Sherriff's Deed, attached as Exhibit 5).

24. In late May 2015, McKinney completed a new Initial Package, including a completed RMA form. Page 9 of the RMA form includes a section seeking information regarding a borrower's racial, ethnic, and sex information, which McKinney initially did not complete, but later completed by checking a box stating that he did not wish to furnish the information.

25. Jesse Rodriguez, a housing counselor at HRS, submitted the May Initial Package through the Hope Loan Portal system—an online system of communicating with mortgage servicers.

26. On May 27, 2015, Rodriguez received a message from Alicia Herrera of Carrington Mortgage, through the Hope Portal, stating that the application was under review. (See Exhibit 6).

4

27. A second message was sent by Herrera on June 5, 2015, stating that additional documents were needed, but the message did not identify which documents were needed. (See Exhibit 7).

28. In a June 26, 2015, message, Herrera informed Rodriguez that McKinney needed to complete section H of the RMA form—the section concerning racial, ethnic, and sex information. (See Exhibit 8).

29. In a letter dated July 6, 2015, Carrington stated that it could not offer McKinney a HAMP modification because he had failed to provide the requested documentation; the only information he had failed to provide at that time was his racial, ethnic, and sex information. (See Exhibit 9).

30. In July, Rodriguez submitted a new Initial Package through the Hope Portal on behalf of McKinney.

31. In a July 16 message, Carrington stated that it had received the new package, but because it was received within 37 days of a scheduled foreclosure sale, it had no obligation to acknowledge the package or postpone the sale.

32. In a message dated July 24, 2015, Carrington states that McKinney was denied for a "Trial" and that McKinney would need to reapply for assistance.

33. In late July, McKinney, with the help of Rodriguez, completed another RMA form and submitted it through the Hope Portal.

34. In an August 6 message, Carrington stated that McKinney's application was under review.

35. McKinney's home was sold at sheriff's sale on August 11, 2015. It sold for $33,915.00, with Carrington Mortgage Services purchasing the home.

36. Under Michigan law, McKinney is entitled to a 6-month redemption period, which ends on February 11, 2016.

### COUNT I—Violation of the RESPA based on loss mitigation violations

37. Plaintiff re-affirms all prior paragraphs by reference.

38. Real Estate Settlement Procedures Act ("RESPA") establishes the requirements for how a mortgage loan servicer or lender must conduct its post-closing servicing of the loan.

39. The Mortgage is a federally-related mortgage loan, which is the first lien on Plaintiffs' home.

40. Defendant is a servicer under RESPA.

41. Part 1024 of Regulation X, 12 C.F.R. § 1024, *et seq.*, contains the regulations related to and interpreting the RESPA.

42. 12 C.F.R. § 1024.41 establishes several loss mitigation review requirements that a servicer like Defendant must comply after a borrower like Plaintiff defaults on a mortgage loan.

43. Under § 1024.41(b), within 5 days of receiving a loss mitigation application, the servicer must provide a notice to the borrower stating whether the application is complete or incomplete. If the application is incomplete, the notice must identify the additional documents the borrower must submit to complete the application, and provide a deadline for supplying the documentation. § 1024.41(b) applies to applications received 45 days or more before a foreclosure sale.

44. "If a servicer receives a complete loss mitigation application more than 37 days

before a foreclosure sale, then, within 30 days of receiving . . ." the application, the servicer must "(i) [e]valuate the borrower for all loss mitigation options available to the borrower; and (ii) [p]rovide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage." 12 C.F.R. § 1024.41(b).

45. 12 C.F.R. § 1024.41 restricts dual tracking of mortgages—that is the practice of reviewing a mortgage for loss mitigation options while simultaneously proceeding with the foreclosure.

46. A servicer is forbidden from initiating a foreclosure if the borrower is 120 days or less delinquent, or the borrower has submitted a timely loss mitigation application. 12 C.F.R. § 1024.41(f).

47. A timely loss mitigation application is one received by the servicer before it has made its first notice or filing required by the foreclosure process. *Id.*

48. If a servicer receives a timely loss mitigation application, it may only initiate foreclosure if, after it reviews the borrower for loss mitigation options, it (a) sends a notice that the borrower does not qualify and the appeal process has run its course; (b) the borrower rejected all offered loss mitigation options; or (c) the borrower fails to comply with an agreement or option. *Id.*

49. "A servicer is only required to comply with the requirements of this section for a single complete loss mitigation application for a borrower's mortgage loan account." 12 C.F.R. § 1024.41.

50. A borrower can enforce the loss mitigation requirements found in 12 C.F.R. §

   1024.41 pursuant to 6(f) of RESPA, which permits an individual to assert a cause of action and recover actual damages and statutory damages, together with costs and reasonable attorney's fees. See 12 U.S.C. § 2605(f).

51. Upon information and belief, McKinney submitted a complete application to Carrington within 120 days of default when he submitted the application in early February 2015.

52. McKinney submitted a complete application to Carrington more than 45 days before a foreclosure sale when he submitted the application in early February 2015 because no foreclosure had been scheduled at that point.

53. Having received a complete application in early February, Carrington had a duty to review McKinney for all available loss mitigation options. See 12 C.F.R. § 1024.41.

54. Carrington additionally had a duty to provide a written notice of its decision within 30 days. *Id.*

55. The only notice that Carrington sent McKinney based on its loss mitigation review was the April 3rd letter, in which it stated that he did not qualify for a modification under the Homes Affordable Modification Program. However, Carrington failed to review McKinney for any other loss mitigation options because it identifies the options that may remain available to him in the letter.

56. Carrington violated 12 C.F.R. § 1024.41(c)(1)(i) by failing to review McKinney for any of the loss mitigation options available other than a HAMP loan modification. Those options included a repayment plan, a special forbearance, and a non-HAMP loan modification.

57. Carrington violated 12 C.F.R. § 1024.41(c)(1)(ii) by failing to send a notice identifying its determination of which loss mitigation options would offer McKinney because it failed to state in its only notice whether McKinney qualified for a repayment plan, special forbearance, or non-HAMP loan modification.

58. Because Carrington failed to properly review McKinney for any loss mitigation option available, and because Carrington failed to properly notify McKinney of its decision based on all loss mitigation options, its April 3, 2015 does not qualify as a proper notice as required by 12 C.F.R. § 1024.41(c)(1)(ii).

59. Because Carrington failed to send a proper notice required by 12 C.F.R. § 1024.41(c)(1)(ii) after McKinney had submitted a complete application, Carrington had no right to initiate foreclosure when it did so on May 13, 2015, by publishing a Notice of Foreclosure in the Times-Indicator.

60. Carrington therefore violated 12 C.F.R. § 1024.41(f) by dual tracking McKinney's mortgage.

61. As a result of Carrington's violations, McKinney's Mortgage was referred to foreclosure rather than reviewed for loss-mitigation options that may have saved his Home, and the Home was sold at a sheriff's sale on August 11, 2015.

62. Pursuant to 12 U.S.C. §2605(f), whoever fails to comply with any provision of RESPA shall be liable to the borrower for any amount equal to the sum of (a) any actual damages to the borrower and (b) any additional damages that the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section in the amount not to exceed $2,000.00.

63. The April 4th Notice appears to be a form notice, and upon information and belief,

      Carrington has a pattern or practice of noncompliance with the requirements of 12 C.F.R. § 1024.41.

64. Costs and attorney's fees are also collectable for a violation of RESPA.  12 USC § 2605(f)(3).

65. Plaintiff suffered a pecuniary damage, including the value of his time in making additional loss mitigation requests, as well as the costs of printing, faxing, and mailing documents; and the loss of his Home in a manner in which he will incur substantial personal liability.

66. Plaintiff suffered additional damage including, but not limited to, frustration and the emotional distress associated with going through a foreclosure of his home.

67. Plaintiff requests that this Court enter a judgment awarding Plaintiff actual and statutory damages, exemplary or punitive damages, together with interest, costs and attorney's fees.

### COUNT II—Violation of the ECOA

68. Plaintiff re-affirms all prior paragraphs by reference.

69. Under the Equal Credit Opportunity Act ("ECOA"), it is unlawful for "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . because the applicant has in good faith exercised any right under this chapter. . . ." 15 USC § 1691(a).

70. A creditor under the ECOA includes an "assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 USC § 1691a(e); 12 CFR § 202.2.

71. At all relevant times, Defendant was and continues to be a creditor as defined by the ECOA.

72. 12 C.F.R. § 1002.13 requires certain creditors to ask borrowers for information relating to their ethnicity, sex, age, and marital status.

73. However, a borrower shall not be required to supply the requested information. *Id.* at (b).

74. A borrower's right not to disclose his or her ethnicity, sex, age or marital status is a right provided under the ECOA.

75. An application for loss mitigation options that includes an application for a loan modification is an application for credit under the ECOA.

76. In June 2015 Carrington rejected McKinney's application for credit solely or primarily because he refused to provide information relating to his ethnicity, sex, age, and marital status, and in doing so, violated § 1691(a) of the ECOA.

77. McKinney was harmed by Carrington's violation of the ECOA because his Mortgage was foreclosed upon instead of being reviewed for loss mitigation options, including a loan modification, based on Carrington's decision to reject his application.

78. Pursuant to 15 U.S.C. § 1691e, Plaintiff may recover actual damages, punitive damages, and reasonable costs and attorney's fees for Carrington's violations of the ECOA.

79. Plaintiff requests that this Court enter a judgment awarding Plaintiff actual damages, exemplary or punitive damages, together with interest, costs and attorney's fees.

**WHEREFORE**, Plaintiff requests that this Court enter a Judgment:

    a. Awarding Plaintiff his actual and statutory damages, exemplary or punitive damages, together with costs and attorney fees.

    b. Providing such other relief that this Court deems just and equitable

Respectfully Submitted            Legal Aid of Western Michigan

Dated: December 4, 2015        ___*/s/ John P. Smith*_____
                                            Legal Aid of Western Michigan
                                            By: John P. Smith (P71368)
                                            Attorneys for Plaintiff
                                            89 Ionia Avenue, N.W., Suite 400
                                            Grand Rapids, Michigan 49503
                                            (616) 608-8047
                                            jsmith@legalaidwestmich.net

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: December 4, 2015        ___*/s/ John P. Smith*_____
                                            LEGAL AID OF WESTERN MICHIGAN
                                            By: John P. Smith (P71368)
                                            Attorneys for Plaintiff
                                            89 Ionia Avenue, N.W., Suite 400
                                            Grand Rapids, Michigan 49503
                                            (616) 608-8047
                                            jsmith@legalaidwestmich.net